**LOVSKOG et al. v. AMERICAN NAT. RED CROSS.**

No. 9269.

Circuit Court of Appeals, Ninth Circuit.

April 8, 1940.

H. L. Faulkner, N. C. Banfield, and Grover C. Winn, all of Juneau, Alaska, for appellants.

Frank H. Foster, of Juneau, Alaska, and Knight, Boland & Riordan, of San Francisco, Cal., for appellee.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

GARRECHT, Circuit Judge.

This is an appeal by persons claiming to be the brother and sister and heirs at law of one Gustaf Lanart, deceased, from a judgment of the District Court of the Territory of Alaska, Division No. 1, which set aside an order of the Probate Court for the Territory of Alaska, Division No. 1, denying admission to probate of a document alleged to be the holographic will of the deceased.

Gustav Lanart Lofskog was born in Sweden and resided in Alaska from about April 1, 1912, until the time of his death. He became a naturalized citizen of the United States December 16, 1918, and at that time he changed his name to Gustaf Lanart. For some time prior to 1936 he was employed as a watchman at a cannery owned by Pacific American Fisheries, located on Gambier Bay, Alaska. He lived in a wanigan, a house built on a scow. On or about December 10, 1936, the body of Gustaf Lanart was found at or near his wanigan. The cannery had been closed for many years and Lanart lived alone as watchman there. His solitude was broken only by chance passers-by, or by an occasional trip to Juneau for supplies.

From the bill of exceptions and exhibits it appears that during his lifetime Gustaf Lanart availed himself of the facilities of the B. M. Behrends Bank of Juneau, Alaska, and was known to its employees. He was approximately 63 years of age in 1936. In October of 1936 Lanart called at the bank with a bundle of papers, which, it afterwards developed, consisted of stocks, bonds, and bank deposit books; these he requested one Morrison, a teller, to place in safekeeping for him. As they were not contained in a box, Morrison declined to accept them. Lanart then procured a small steel box, placed the papers therein, locked and sealed the box, and it was accepted and kept in the bank until after Lanart's death,

when Guy McNaughton, vice-president and cashier of the bank, was appointed administrator of the estate. Accompanied by Judge Felix Gray, the probate judge, the administrator with Mr. Monagle, his attorney, went to Gambier Bay, where Lanart had lived, and entered the wanigan. One end of the house boat was tied to the beach, which sloped down into the water, and at high tide it was partially submerged; the interior was a wreck. After looking the place over they proceeded up the bay to the house of a fox farmer, who had a bundle of papers which had been given him by a Mr. and Mrs. Mathews, purporting to have been the property of Lanart. This bundle, which was wet and showed evidence of submersion, contained bills, advertisements and clippings, and some pages of a memorandum book. On these pages were lists of guns and various notes. Written across two of the pages was the following:

"After death

"Please forward all to Red cross, (as I don't think any relatives are alive) the mihgt be able to do some good with the little I have

"Gambier Bay

"Oct 22 1932

"Gus Lanart

"Eagles aerie No 1 Seattle will take care of the burial

"What is not mentioned in this will belong to PAF Bellingham the are the owners."

Inspection of the original document reveals that the pages had been wet and dried out. A few of the words are rather faint or faded, notably the word "little," which counsel for appellants contend should be regarded only as a blank space. After carefully viewing the original exhibit we think there can be no reasonable doubt that the word in conflict is "little". In the document the word "they" is twice spelled "the," but in each instance the meaning is clear and, in our opinion, the missing letter is inconsequential; "PAF" unquestionably refers to Pacific American Fisheries. It was testified to, and not contradicted, that the handwriting was that of the deceased.

The will was admitted to probate August 10, 1937. Guy McNaughton, the administrator of the estate of Gustaf Lanart, deceased, moved that letters testamentary be issued him, and hearing was set for January 31, 1938. January 25, 1938, a motion was filed praying that the will be set aside

90

and a decree entered in favor of the appellants herein, who were asserted to be the brother and sister of the deceased. On February 9, 1938, both motions were argued to the probate judge, who decreed that the order of August 10, 1937, admitting the will to probate be set aside and the Letters issued on the same day be revoked, and it was further decreed "that Erik Enar Krister Lovskog and Svanhild Sally Vilhelmina Abrahamsson, a brother and sister of the deceased, are legally the sole heirs".

The American National Red Cross appealed to the court below, which rendered a "Memorandum Decision" and entered an order reversing the Probate Court. This appeal in behalf of the alleged brother and sister followed. The appellants raise two questions:

(1) "Is the instrument sufficient to constitute a holographic will, or any will, under the law, regardless of the identity of the beneficiary?"

(2) "If the instrument is otherwise valid as a will, is the alleged beneficiary sufficiently identified to entitle it to receive the proceeds of the estate of deceased?"

■ Before considering other questions we first look into the jurisdictional phase of the case. Section 4571 of the Compiled Laws of Alaska (1933) permits an appeal to the District Courts for the Territory from all orders, decrees, and judgments of the Commissioner exercising the jurisdiction of a court of probate. 28 U.S.C.A. § 225 vests in this court appellate jurisdiction to review by appeal final decisions of the district courts for Alaska. The case is properly before us.

■ We turn to the first question presented. The Compiled Laws of Alaska (1933) do not define a holographic will, nor any will, ordinary or otherwise. Section 4612 thereof provides that "Every will shall be in writing, signed by the testator, or by some other person under his direction, in his presence, and shall be attested by two or more competent witnesses, subscribing their names to the will in the presence of the testator." Olographic wills are mentioned in Section 4624, which reads: "Olo-

graphic wills; how proved. Olographic wills, with or without attestation, shall be admitted to probate the same as other wills and be proved in the same manner as other private writings."

There is no mention of an olographic will in Carter's Alaska Code (1900), Part Five—The Civil Code—Ch. XV, §§ 137–167. Neither is there mention of such type of will in the Compiled Laws of Alaska (1913), Civ.Code, Ch. 15, §§ 563–593. It is to be noted that the Carter Code was based upon the Laws of Oregon; the Compiled Laws of Alaska (1913) had its origin in the Carter Code and the latter's successor, the Charlton Code. A diligent search of the Alaska Reports failed to reveal any reported case from the District Courts of the Territory which discussed such a will. Nor has investigation of the Oregon Code* been more fruitful, for olographic wills are not mentioned therein, either in the 1930 code or Lord's Oregon Laws (1919). Section 7319 of the latter compilation provides for the form or manner of executing a will and requires two or more witnesses. This section was originally enacted in 1853. Section 10-503 of the 1930 Oregon Code has the same requirement and is based upon the same original enactment. In Simpson v. Durbin, 1913, 68 Or. 518, 136 P. 347, a paper, purporting to be a will and wholly in the handwriting of the testator, witnessed by two persons, was admitted to probate as duly executed, and upheld on appeal. The writer of the opinion referred to the paper as "a holograph will". In another case, Montague v. Schieffelin, 1905, 46 Or. 413, 80 P. 654, a paper purporting to be a will and a letter, apparently both in the handwriting of the decedent, were refused admission to probate because not witnessed, as required by law. We derive little assistance from the laws and decisions of Oregon, save that it seems clear an olographic will is admitted to probate if duly witnessed and refused if not witnessed; that it is wholly in the handwriting of the testator is therefore immaterial.

Acceptance of an olographic will by the laws of Alaska is comparatively recent. April 2, 1915, the following enactment (Session Laws of Alaska, 1915, Second Session,

*The Act of May 17, 1884, of the 48th Congress of the United States, 23 Stat. 24, 25, 26, provides: "Sec. 7. That the general laws of the State of Oregon now in force are hereby declared to be the law in said district [of Alaska], so far as the same may be applicable and not in conflict with the provisions of this act or the laws of the United States; * * *." See also 37 Stat. 512, c. 387, § 3, 48 U.S.C.A. §§ 23, 24, 80.

Ch. 4, p. 4) was approved by the Governor of the Territory:

"Be it Enacted by the Legislature of the Territory of Alaska:

"That Section 564, Chapter Fifteen, Title XII, of the Compiled Laws of the Territory of Alaska, be, and the same is hereby amended so as to read as follows:

"'Section 564: Every will shall be in writing, signed by the testator, or by some other person under his direction, in his presence, and shall be attested to by two or more competent witnesses, subscribing their names to the will in the presence of the testator. The term "will", as used in this Chapter, shall be so construed as to include all codicils; Provided, however, that olographic wills, with or without attestation, shall be admitted to probate the same as other wills and be proved in the same manner as other private writings.'"

The manner in which this enactment is divided in the code might possibly foster some doubt whether olographic wills are entitled to probate in Alaska, but when the measure is read in its entirety such doubt is cleared away. Moreover, the measure as first proposed in the House of Representatives for the Territory of Alaska (March 11, 1915), did not contain the words "with or without attestation", but these words were added by a Senate amendment, in which the House concurred. See Journal of the House, Territory of Alaska, 1915, pp. 50, 55, 71, 77, 120, 123, 124, and Journal of the Senate, Territory of Alaska, 1915, pp. 69, 72, 76, 78, 95, 100, 104, 108.

Bouvier defines "Olographic" as "A term which signifies that an instrument is wholly written by the party". The same work says a "Holograph" is "That which is written with one's own hand". "Holograph" is defined in Webster's New International Dictionary, 2d Ed. (1935), as follows: "A document, as a letter, deed, or will, wholly in the handwriting of the person from whom it proceeds and whose act it purports to be. In the Civil Law and the systems based upon it a holograph writing need not be attested by subscribing witnesses, notarial seal, etc., to be authenticated, but is said to prove itself. This is the case in Scotland, Quebec, Louisiana, and generally on the continent of Europe. At the common law holographic documents have no superior validity."

A short answer to the objection here urged may be made by pointing out that the laws of Alaska do not define the different types of wills. However, under the statutes of Alaska a will in the handwriting of the testator does not require witnesses, as in the case of other wills, this formality being obviated by Section 4624 of the Compiled Laws of Alaska, which eliminates the necessity for witnesses to holographic wills. Therefore a will proved to be in the handwriting of the testator is entitled to probate.

Under the first contention the appellant also argues that the instrument in question is not a will because there is no testamentary language used and there is no definite description of the property. Counsel urge that the "word 'forward' is not a testamentary word"; that the word "all" is not sufficiently descriptive. The writer used the words "After death" and "this will", and such words are persuasive that he meant to dispose of his estate by the instrument. The testator was not a lawyer but a humble watchman, and we should not expect him to express himself in precise legal phraseology. Neither the word "forward" nor the word "all", as used, present any difficulty of construction if we give consideration to the intention of the testator as expressed in the entire writing. As used, the word "forward", in the sense of "transmit", seems as effective as "give" or "bequeath" to accomplish the purpose of the testator. Webster, supra, authorizes the use of the word "all" in the sense of "the whole of one's possessions, or of what one holds dear; * * *." All things considered, the instrument satisfactorily indicates the undoubted intent of the testator.

The remaining question to be considered is the definiteness in designation of the beneficiary. Counsel for the appellant maintain that "The words 'Red Cross' do not describe any organization or corporation", and, although they concede "extrinsic evidence may be introduced for the purpose of showing just who or what was meant by a beneficiary improperly named or whose identity is uncertain", they argue that no evidence was introduced to clarify the difficulty. The well-considered case of State v. American National Red Cross, 60 S.D. 608, 245 N.W. 399, effectually answers this contention. The testator there had made the "Red Cross Society" residuary legatee; both the American National Red Cross and the local organization claimed and intervened. On appeal the Supreme Court of South Dakota said (at page 400 of 245 N.W.):

"Appellant [state, which claimed under escheat laws] urges the failure of testator to specifically name and identify the beneficiary in the residuary clause, in that he used the term 'Red Cross Society'; that the designation is so uncertain that it may mean the American National Red Cross of Washington, D. C., or it may mean the local chapter of the Red Cross of which he was a member, and that it is therefore most likely that he wished to bestow the gift upon the local organization. * * * An investigation of authorities as to what particular society testator had in mind seems to indicate that the words 'Red Cross Society' means the national organization. [Cases cited.] This belief is strengthened by the wording of the congressional act or charter creating the American National Red Cross (36 U.S.C.A. § 1 et seq.). 36 U.S.C.A. § 4 of said act of Congress being as follows: 'It shall be unlawful for any person * * * to use within the territory of the United States of America and its exterior possessions the emblem of the Greek red cross on a white ground, or any sign or insignia made or colored in imitation thereof or the words "Red Cross" or "Geneva Cross" or any combination of these words.'

"It would therefore seem that there is some presumption at least when one speaks of the Red Cross or the Red Cross Society that the speaker, when not limiting and specifically pointing out the fact that he has in mind a different organization, such as local chapters, he means the American National Red Cross. If it were the wish of the testator to bestow upon the Wakonda Branch of the Clay County Chapter of the Red Cross, it is quite natural that he would have used appropriate language to refer directly by name or some suitable way of designating the local chapter or organization. We feel that the learned trial court was fully justified under the evidence in so finding and that we are not warranted in disturbing his findings and conclusions as to the intention of the testator."

It is to be noted that in the case quoted the testator apparently was a member of the local chapter of the Red Cross and that chapter claimed to be the legatee under the will. Appellant's case of New Jersey Title Guarantee & Trust Co. v. American National Red Cross, et al., 111 N.J.Eq. 12, 160 A. 842, is distinguishable on the facts in that the testator named "the New Jersey Chapter of the American Red Cross" as the legatee under the will and it appeared from the evidence that there was no chapter so designated but there was a Jersey City Chapter, and it further appeared that he had aided such chapter previously and had made known to a witness "that his sole desire was to aid the chapter of the American Red Cross Society with which she was identified", which was the said Jersey City Chapter, 160 A. 844. In the case at bar no claim was made by any local chapter of the Red Cross.

Affirmed.